UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHANA GRAY, Individually and on behalf of all others similarly situated, | Civil Action No. 18-cv-7336 |
| Plaintiff, | |
| v. | |
| THE CJS SOLUTIONS GROUP, LLC d/b/a THE HCI GROUP, | |
| Defendant. | |

**PROPOSED INTERVENOR BORUP'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO INTERVENE AND TRANSFER**

**INTRODUCTION**

Pursuant to Fed. R. Civ. P. 24(b) and the "first-to-file rule," this Court should transfer this case (*Gray*), in its entirety, to the United States District Court for the District of Minnesota for assignment to the Hon. Paul Magnuson. Adjudicating *Gray* in this jurisdiction risks: (1) prejudice to the putative collective action members through a potential reverse auction settlement; (2) a waste of judicial resources through duplicative proceedings; (3) confusion to collective members; and (4) potential inconsistent judgments. In accordance with federal authorities, the first-filed and further advanced FLSA case, *Borup et al. v. The CJS Solutions Group, LLC d/b/a The HCI Group*, Case No. 0:18-CV-01647 (D. Minn.), is the lead case and this case should be transferred accordingly.

Proposed intervenor, Timothy C. Borup, respectfully submits this Memorandum in support of his motion to intervene and transfer. Borup is a collective and class representative in a competing FLSA lawsuit, the earlier-filed *Borup* action. Because absent collective and class

1

members are liberally allowed to intervene to seek transfer in these circumstances, and because *Borup* timely filed this motion, the Court should allow him to intervene for the limited purposes stated.

## FACTS

A.     THE *SANDERS* SETTLEMENT AND FINAL JUDGMENT

Defendant is a company headquartered in Jacksonville, Florida that, *inter alia*, provides software training for hospital personnel throughout the United States. It provides this software training through workers it refers to as "consultants." The software at issue is commercially available software, such as Epic Software. The consultants were and are located throughout the United States, and travel to various hospitals and other medical facilities to work.

In 2017, three separate lawsuits were filed against the Defendant on behalf of consultants due to the Defendant's failure to pay overtime resulting from classifying the workers as independent contractors. The three lawsuits were eventually consolidated and settled in one proceeding: (1) the lead case *Sanders et al. v. The CJS Solutions Group, LLC,* Case No. 1:17-03809 (S.D.N.Y.), filed May 19, 2017; (2) *Allen v. The CJS Solutions Group, LLC*, Case No. 1:17-07085 (S.D.N.Y.), filed September 18, 2017; and (3) *Garrett v. The CJS Solutions Group, LLC*, Case No. 2:17-00863 (W.D. Wash.), filed June 5, 2017. These three cases will be collectively referred to herein as the *Sanders* lawsuit. Ex. A, Dockets.[1]

On February 13, 2018, a proposed final settlement was reached and filed in the three consolidated lawsuits for the consultant workers at issue. The *Sanders* settlement provided for: (1) a national "opt-in" settlement for FLSA claims; (2) a New York state law "opt-out" Rule 23

---

[1] "Ex. ___" refers to the Exhibits attached to the Declaration of T. Joseph Snodgrass.

settlement; and (3) a North Carolina state law "opt-out" Rule 23 settlement. Ex. B, Settlement Agreement.

The court-imposed deadline to opt-in and participate in the *Sanders* lawsuit and settlement was May 21, 2018. Ex. C, Final Approval Motion at 3. According to post-settlement filings in the *Sanders* lawsuit, 2,089 consultants were eligible to participate in the *Sanders* settlement, but only 1,037 consultants chose to opt-in by the deadline. *Id*. at 2. Ultimately, the *Sanders* settlement provided 98% of the overtime wages owed to the consultants with the payment of no liquidated damages. *Id*. at 8.

The attorneys' fees recovered by the *Sanders* attorneys were $1,080,000. Ex. D, Order at ¶ 5. There were no contested motions filed in the *Sanders* lawsuits, and no depositions were reportedly taken. *See* Ex. E, Decl. of Schalman-Bergen at ¶¶ 39-43.

Under the FLSA, and under the *Sanders* settlement, only workers who chose to opt-in to the lawsuit on or before February 28, 2018 would release their claims under the FLSA. *See* Ex. B, Settlement Agreement at ¶ 14.s. Over 1,000 consultants chose not to participate in the *Sanders* lawsuit, and therefore have not released their FLSA claims. Final judgment was entered in the *Sanders* lawsuit on June 22, 2018. Ex. D, Order at ¶ 11.

**B.    THE *BORUP* LITIGATION**

After the *Sanders* settlement filing, the Defendant continued to refuse to pay overtime to all of its consultants, including proposed intervenor Borup. In May, 2018, Borup (an Ohio State student) worked for the Defendant as a "consultant" teaching Mayo Clinic employees how to use a commercial software program called Epic in Rochester, Minnesota. HCI failed to pay him overtime for all hours worked.

On June 13, 2018, Borup filed a lawsuit on behalf of himself and other similarly situated "consultants" who worked for the Defendant.  Ex. F, Borup Complaint.  At the time the *Borup* litigation was commenced, there were no other non-settled FLSA lawsuits seeking collective action status pending against HCI for consultants, and no other lawsuits containing non-settled Rule 23 state law claims.  At the time of suit, the court-ordered time period to opt-into the *Sanders* lawsuit and settlement had expired.

Borup brought a nationwide FLSA collective action against the Defendant on behalf of himself and other similarly-situated consultants. *Id*.  He also brought Minnesota state law claims on behalf of a Rule 23 class.  *Id*.  In his lawsuit, Borup seeks to represent a nationwide collective of consultants, with the sole exception of FLSA claims of individuals who filed opt-in forms in the *Sanders* lawsuit. To date, 11 workers have opted into the *Borup* lawsuit. Ex. G, *Borup* Docket.  The opt-ins include workers who worked on non-Mayo, non-Minnesota projects.

Borup and the Defendant have specifically litigated the proper scope of the *Borup* litigation, and whether it includes consultants who chose not to participate in the *Sanders* settlement. On February 13, 2019, in a 13-page ruling, the *Borup* court ruled that the scope of discovery for the *Borup* litigation properly includes persons who did not settle their claims in the *Sanders* lawsuit and includes, for example, Shana Gray, the plaintiff here.  Ex. H, Order at 5-7, *Borup et al. v. The CJS Solutions Group, LLC d/b/a The HCI Group*, Case No. 0:18-CV-01647 (D. Minn. Feb. 13, 2019).

Specifically, the *Borup* court ruled that the Defendant must turn over lists of workers for those who did not participate in the *Sanders* settlement, including broad records for all of the workers who did not participate in the *Sanders* settlement, including records for the plaintiff and opt-ins in this case. *Id.* at 7-12.

4

A scheduling order has been filed in the *Borup* litigation, requiring the FLSA and state law certification motions to be heard on or before April 1, 2019. Ex. G, *Borup* Docket. Deposition discovery has commenced in Minnesota.

**C.   THE *GRAY* LAWSUIT, THE REVERSE AUCTION FACTORS AND BORUP'S DISCOVERY OF THE COMPETING *GRAY* CASE**

Two months after the *Borup* lawsuit was filed, on August 14, 2018, a Georgia resident filed this parallel, overlapping FLSA lawsuit seeking collective action status in the Southern District of New York by a consultant who apparently did not participate in the *Sanders* settlement. Neither the *Gray* plaintiff nor the Defendant resides in this district. To date, five workers have opted into the *Gray* lawsuit.

*Borup's counsel was not aware of the existence of the later-filed Gray lawsuit or any other pending lawsuit until Thursday, January 31, 2019.* For reasons unknown to Borup's counsel, a national search on the Public Access to Court Electronic Records ("Pacer") for the entity "CJS Solutions" does not reveal the existence of this case.

On September 18, 2018, the parties to the *Borup* lawsuit entered into a nationwide tolling agreement for all consultants. The Defendant demanded that Borup agree to its chosen mediator, John Phillips, of Husch Blackwell in Kansas City, Missouri. The Defendant's mediator scheduled an in-person mediation session for November 28, 2018.

At the same time, and unbeknownst to Borup's counsel, the Defendant was choosing a different mediator for the overlapping *Gray* lawsuit with different Plaintiffs' counsel. Specifically, in the later-filed *Gray* lawsuit, the Defendant was negotiating with Stephen Sonnenberg of JAMS Endispute in New York. According to filings in the later-filed *Gray* case, Mr. Sonnenberg was to preside over an initial mediation on December 13, 2018 and then, again, on January 10, 2019.

5

A "reverse auction" takes place when a defendant seeks to separately and serially negotiate with different groups of plaintiffs' attorneys on behalf of the same group of people—and then chooses to settle only with the attorneys who provide the steepest discount. For obvious reasons, reverse auctions are disfavored by federal courts. As 4 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 13:57 (5th ed. updated Nov. 2018) instructs:

> In a normal auction, the seller accepts the highest bid. In a reverse auction, the seller looks for the lowest bid. As applied to class actions, the defendant is conceptualized as "selling" a settlement and is looking to do so for the lowest amount of money possible. This quest is aided when there are multiple class actions with multiple class counsel "bidding" to buy the settlement. Each set of class counsel should, in theory, hold out for a higher amount from the defendant because they get a percentage of whatever settlement amount they secure. However, the hitch that enables a reverse auction is that, generally speaking, only one set of plaintiffs' attorneys—those that settle—will get any fees, and attorneys pursuing all the parallel cases will get nothing. Therefore, the defendant can play the plaintiffs' attorneys off against one another, bargaining down the price of the settlement in exchange for ensuring the lowest selling attorneys that they will be the ones to get a fee out of the case. The problem in the reverse auction situation is that the class's interests have been sold out, and class members will get less than the full value of their claims.

*Id.*

"Markers of a reverse auction include the presence of overlapping class actions involving similar claims against the same defendant; settlement discussions initiated by the defendant; settlement bargaining limited to one of the competing groups of plaintiffs' attorneys; settlement with the group of attorneys who present a less substantial threat of carrying the case forward to trial; lack of an extended process of settlement bargaining; [and] agreements that promote the award of lucrative and potentially unjustified attorneys' fees …." Jonathan R. Macey, *Judicial Review of Class Action Settlements*, 1 J. LEGAL ANAL. 167, 191 (2009).

6

During settlement negotiations with the Defendant, at the request of the Defendant, Borup's counsel made specific settlement recommendations for the putative collective action members—including the workers who chose not to participate in the *Sanders* settlement—and included amounts for unpaid wages, travel time and liquidated damages.[2]  Again, Borup was not aware of the existence of other litigation during these negotiations.

The Defendant specifically rejected all of Borup's settlement recommendations for the collective action members' unpaid wages as "too high."  Defendant then withdrew from negotiations in *Borup*.

At no time during the collective action settlement negotiations with Borup did the Defendant inform Borup or his counsel of: (1) the existence of the parallel, overlapping later-filed litigation; (2) the existence of another chosen mediator; (3) the existence of another chosen mediation date immediately after the scheduled mediation date set in *Borup*; or (4) the amounts of any recommended demands and offers for the putative collective action members presented by the Defendant and the plaintiff's counsel in the later-filed *Gray* case.

The attorneys in the *Gray* lawsuit have informed Borup's counsel that they will not coordinate with Borup's counsel concerning settlement, nor disclose the negotiation positions that they and the Defendant have taken with respect to the workers at issue in both lawsuits.

### ISSUES PRESENTED AND STANDARD OR REVIEW

The two main issues presently before this Court are: (1) whether the Plaintiff in the first-filed *Borup* case should be permitted to intervene in *Gray*, which was filed two months after

---

[2] Because court approval is required for any FLSA collective action settlement, *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015), as well as any class action settlement, Fed. R. Civ. P. 23, Borup cannot make a binding offer for settlement, and can only provide HCI with the terms for which he and his counsel would recommend settlement to putative collective action members and the Court.

*Borup*; and (2) whether, under the first-to-file rule, the second-filed and duplicative *Gray* case should be transferred to the federal court of the first-filed *Borup* case, the District of Minnesota, for further proceedings. *E.g., Dewan v. M-I, LLC*, No. H-12-3638, 2014 WL 2983162 (S.D. Tex. June 27, 2014) (allowing intervention by first-filed FLSA plaintiff and ordering transfer to first-filed jurisdiction).

"Whether to grant permissive intervention is entirely within the discretion of the trial court." *U.S. v. New York City Hous. Auth.*, 326 F.R.D. 411, 417 (S.D.N.Y. 2018). Similarly, if the first-to-file rule is found to apply, the court's decision to stay, dismiss or transfer the later-filed case is subject to the trial court's discretion. *Wyler-Wittenberg v. MetLife Home Loans, Inc.*, 899 F. Supp. 2d 235, 247 (E.D.N.Y. 2012) (exercising discretion to transfer competing FLSA collective action to first-filed jurisdiction).

## ANALYSIS

**I.    BORUP SHOULD BE ALLOWED TO INTERVENE UNDER FED. R. CIV. P. 24(b) FOR THE PURPOSE OF SEEKING TRANSFER OF THIS CASE (*GRAY*) TO THE FIRST-FILED JURISDICTION.**

Federal Rule of Civil Procedure 24(b)(1)(B), addressing permissive intervention, states, "on timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." *Id*. Pursuant to Rule 24(b)(2)(3), in determining the propriety of intervention, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Id.*

Courts should construe the permissive intervention rule "liberally" and "in favor of intervention." *Delaware Trust Co. v. Wilmington Trust, N.A.*, 534 B.R. 500, 509 (S.D.N.Y. 2015). Rule 24(b) "underscores … the need for a liberal application in favor of permitting intervention." *U.S. Postal Service v. Brennan*, 579 F.2d 188, n.2 (2d Cir. 1978).

The permissive intervention analysis focuses on the factors of commonality between suits and timeliness/delay. William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 9:31 (5th ed. Dec. 2017) (citing *U.S. v. Pitney Bowes, Inc.*, 25 F.3d 66, 73 (2d Cir. 1994)). Certainly, the instant intervention motion is timely as the Defendant has not answered the complaint in this lawsuit, neither formal discovery nor any contested motion practice has taken place, the intervention motion was filed shortly after counsel in the first-filed suit learned of the existence of this case, and no scheduling order has been entered.

Here, the parties in both cases challenge the same policies on behalf of the same group of workers—namely, Defendant's misclassification of workers (who show customers how to use commercial software) as "independent contractors" and corresponding refusal to pay overtime. They bring the same claims under the FLSA. Discovery concerning all of the putative collective action members (including the *Gray* plaintiffs and opt-ins) has been ordered to go forward in Minnesota. The motion is timely and should be granted. And, as highlighted in the next section, permissive intervention to address the first-to-file rule is appropriate.

## II. THIS COURT SHOULD TRANSFER THE *GRAY* ACTION UNDER THE FIRST-TO-FILE RULE.

This Court should transfer the *Gray* action pursuant to the first-to-file rule that dictates that the court in which the claims are first filed is the appropriate court to determine how a subsequently-filed case involving the substantially similar issues should proceed. Doing so eliminates the duplication of substantially similar litigation efforts, avoids conflicting rulings, avoids encroaching upon the authority of sister courts, and prevents confusion among putative class members and piecemeal resolution of issues that call for a uniform result.

The Second Circuit adheres to the general rule that where there are two competing lawsuits, there is a "presumption" that the first suit should have priority, absent a showing of

balance of convenience or special circumstances giving priority to the second. *First City Nat'l Bank & Trust Co.*, 878 F.2d 76, 79 (2d Cir. 1989) (discussing "the presumption in favor of allowing the controversy to be adjudicated in the forum where it was first filed"). The rule provides:

> When determining whether to apply the first-filed doctrine, 'the court considers whether the lawsuits at issue assert the same rights, and seek relief based upon the same facts. The lawsuits need not be identical, but the claims and rights raised in the two actions must not differ substantially."

*Burns v. County of Nassau*, 337 F. Supp. 3d 210, 213 (E.D.N.Y. 2018).

Pursuant to the first-to-file rule, courts routinely transfer, stay, or dismiss FLSA collective actions that are filed after, and substantially overlap with, earlier-filed FLSA collective actions. *See, e.g.*, *id*. ("The Plaintiffs cannot escape the first-filed rule simply because they chose not to opt-into the *Arciello* collective action."); *Wyler-Wittenberg*, 899 F. Supp. 2d at 247 (transferring competing FLSA collective action to first-filed jurisdiction); *Dewan*, 2014 WL 2983162, at *4 ("[T]he Court finds the [employer] failed to show compelling circumstances that would warrant denial of the motion to intervene and transfer pursuant to the first-filed rule …."); *White v. Peco Foods, Inc.*, 546 F. Supp. 2d 339, 342 (S.D. Miss. 2008) ("Applying the first-to-file rule to the current case, it is highly likely that issues and parties from the first-filed action might substantially overlap … [b]oth actions are brought by current of former employees against their common employer, based upon Peco's alleged violations of the FLSA."); *Abushalieh v. Am. Eagle Exp.*, 716 F. Supp. 2d 361 (D.N.J. 2010) ("It is in the interest of justice, and it is further consistent with the principles behind the first-filed rule, that these mirror-image [FLSA] causes of action be litigated in the same form."); *Fuller v. Abercrombie & Fitch Stores, Inc.*, 370 F. Supp. 2d 686 (E.D. Tenn. 2005) (same).

### III. THE FIRST-TO-FILE RULE APPLIES REGARDLESS OF ANY PROPOSED SETTLEMENT.

Because the Defendant-employer has serially and separately negotiated with competing counsel in both *Borup* and *Gray*, it is expected that the parties to the *Gray* litigation will seek to present a proposed FLSA settlement to this Court for approval in the near future.[3] As such, they may oppose this motion and argue that the first-to-file rule should be ignored in light of a proposed settlement in the later-filed collective action. Federal authorities strongly suggest that this Court should not act upon any such request, as the proposed settlement would be further evidence of the appropriateness of following the first-to-file rule.

The first-to-file rule is intended to avoid problems with settlement negotiations in competing FLSA lawsuits:

> *The first-to-file rule is particularly appropriate in the context of competing FLSA collective actions,* which threaten to present overlapping classes, multiple attempts at certification in two different courts, and *complicated settlement negotiations.* It is not surprising that federal courts consistently apply the first-to-file rule to overlapping wage and hour collective actions.

*Ortiz v. Panera Bread Co.*, No. 1:10-1424, 2011 WL 3353432, at *2 (E.D. Va. Aug. 2, 2011) (emphasis added).

More specifically, when presented with similar factual and procedural scenarios, federal courts regularly stay, transfer or dismiss later-filed actions in which a settlement is recently proposed pursuant to the first-to-file rule because of potential concerns over a reverse auction. For example, in *Martin v. Cargill, Inc.*, 295 F.R.D. 380 (D. Minn. 2013), the parties to a later-filed federal class action attempted to present a settlement that would end the putative first-filed

---

[3] Under the FLSA, a Court must approve any proposed collective action settlement. *Cheeks*, 796 F.3d at 206; *see also, supra,* note 2.

class action pending in the District of Hawaii. The court in the District of Minnesota refused to approve the settlement in the later-filed action, in part because of reverse auction considerations:

> The Manual for Complex Litigation notes that there are a number of recurring potential abuses in class action litigation that judges should be wary of as they review proposed settlements. They include, among other things, the existence of a "reverse auction," in which a defendant, seeing competing class cases, cherrypicks the attorneys willing to accept the lowest class recovery in exchange for enhanced fees...
>
> Notably, at the time this action was filed, [the first-filed action] was already pending in the District of Hawaii, asserting the same claims against the same defendant on behalf of a substantially similar (if not entirely duplicative) nationwide class. The Court is not powerless to act in this situation. Under the "first-filed rule," the court "initially seized of a controversy" generally "should be the one to decide the case."

*Id*. at 388 (internal citations omitted). By subsequent order, the Court held:

> [T]his Court disagrees with the parties that this case is "the most developed" of the competing actions. This argument was largely predicated on the proposed settlement.... [T]he Court previously noted its concerns with the manner in which this action was litigated, in particular the seemingly clandestine attempt to undercut [the first-filed action]. Transferring this case to Hawaii would, therefore, further the interests of justice, undermine the appearance of forum shopping and prevent counsel from being rewarded for these questionable tactics. In summary, the Court concludes the first-filed rule – and the interests of justice – compel the transfer of the action to the District of Hawaii.

*Martin v. Cargill, Inc*., Case No. 13-2563 (D. Minn. May 2, 2014) (attached at Ex. I).

Another example was presented in *In re: Checking Account Overdraft Litigation*, 859 F. Supp. 2d 1313 (S.D. Fla. 2012), wherein the defendant sought a stay of a first-filed class action based on another court's preliminary approval of a class action settlement in a second-filed, overlapping class action of which the other parties were not aware. Rather than staying the first action, the court enjoined the second action—and the settlement sought therein—pursuant to the first-to-file rule. *Id*. at 1325. In so doing, the court found that following the first-to-file rule would prevent the Court from having to delve into whether the proposed settlement in the second

class action was accomplished as a "reverse auction." *Id*. at 1322 ("Without delving into the details of the … parties and their counsel to determine whether, in fact, [they] engaged in a reverse auction and/or whether the [parties] colluded, this Court is empowered by the … first-to-file rule to enjoin [the parties] from proceeding in any manner with the proposed settlement that has been preliminarily approved in *Thomas*.").

This same reasoning was also applied in *Browning v. Tracfone Wireless, Inc.*, Case No. 13-22882 (S.D. Fla.). In *Browning*, the first-filed attorneys intervened and moved to transfer the later-filed class action to the Northern District of California over the objections of the later-filed parties who proposed to settle the case in the Southern District of Florida. Ex. J, Hearing Transcript at 4.

The intervenors argued that the putative settlement could not go forward due to the first-to-file rule. The intervenors specifically argued that to go forward with settlement approval would result in increased litigation over reverse auction allegations:

> When the time comes, if the settlement approval process continues here, you can expect a continuing objection to whether or not this Court should have exercised the discretion for the first-filed rule. And all of the indicia that makes this filing, this case, this settlement look like a reverse auction, in other words one set out with the intent to – of the defendant to run to the lowest bidder will be a stain on the case through the approval process, the objection, and on appeal in the future.

*Id.* at 21. One week after oral argument, the district court ordered the later-filed case transferred to the first-filed jurisdiction and assigned to the same judge. Ex. K.

In short, these several decisions demonstrate that the proper course for this Court, upon receipt of a proposed FLSA settlement in the later-filed case, is to transfer this case to the first-filed jurisdiction, assigned to the same judge. The proper course is not to delve into issues associated with a reverse auction by the later-filed class action as such issues are for the first-filed court.

## **CONCLUSION**

For the aforementioned reasons, proposed intervenor Timothy C. Borup respectfully seeks an Order allowing his proposed intervention and transferring this case to the District of Minnesota.

Dated this 21st day of February, 2019.    **Larson • King, LLP**

By *s/Daniel C. Adams*
Daniel C. Adams  (NY#2815371)
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
(651) 312-6500 Phone
(651) 312-6618 Fax
dadams@larsonking.com
**Attorneys for Timothy Borup, Proposed Intervenor**

1827128