UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Shana Gray, individually<br>and on behalf of all others<br>similarly situated,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>The CJS Solutions Group, LLC<br>d/b/a The HCI Group,<br><br>　　　　　　Defendant. | Civ. No. 19-1008 (PAM/DTS)<br><br><br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on Plaintiff's Renewed Motion for Settlement Approval. For the following reasons, the Motion is denied without prejudice.

**BACKGROUND**

In 2017, individuals who had performed consulting work for Defendant The CJS Solutions Group d/b/a The HCI Group ("HCI") filed three lawsuits against HCI. These putative collective and class-action lawsuits alleged that HCI misclassified its consultants as independent contractors and, because of that misclassification, failed to pay overtime for hours worked over 40 hours per week as state laws and the federal Fair Labor Standards Act ("FLSA") require. The three lawsuits were ultimately consolidated into Sanders v. CJS Solutions Grp., 1:17cv3809 (S.D.N.Y.).

The original Sanders complaint defined the putative FLSA collective as "[a]ll individuals who were classified as independent contractors while performing consulting work for [HCI] in the United States from May 19, 2014 to the present." (Sanders Compl. (Docket No. 1) ¶ 8; see also Sanders Am. Compl (Docket No. 92) ¶ 11 (same definition).)

The collective as finally certified was "[a]ll individuals who performed work as a Consultant for [HCI] at any time from May 19, 2014 through on or about May 31, 2017." (Sanders Docket No. 106 ¶ 2.)  The term "consultant" is not defined in either the pleadings or the Sanders settlement agreement.

The parties settled Sanders in fall 2017 for $3.24 million.  Just over 58 percent of the Sanders collective cashed a check under the settlement and thereby released their federal claims.  Sanders also raised claims under state law, for which a Rule 23 class was certified.  All putative class members in Sanders who did not opt out, whether they cashed their settlement check or not, thus released their state-law claims.  Only a handful of individuals opted out.

Meanwhile, in May 2017, HCI reclassified certain consultants and thereafter paid those individuals overtime for hours worked over 40 hours a week.  HCI did not, however, reclassify those consultants who were medically trained.  HCI calls this subset of consultants "Resident Activate Support Specialists," but they, like the individuals involved in Sanders, were also referred to as "at-the-elbow" consultants, or ATEs.[1]  According to the briefing, HCI classified only 120 individuals as Resident Activate Support Specialists, and all of these individuals worked at the Mayo Clinic.

In June 2018, the day before the Sanders parties filed a motion for final approval of that settlement, Thomas Borup filed an action against HCI, asserting claims under FLSA and Minnesota law.  Borup v. The CJS Solutions Grp., LLC, No. 18cv1647 (D. Minn. filed

---

[1] Indeed, Gray refers to all consultants as ATEs throughout her Complaint.  (See, e.g., Compl. (Docket No. 1) ¶¶ 1, 9, 11, 12.)

Jun. 13, 2018). Borup is a medical-school graduate who worked as a consultant for HCI at the Mayo Clinic in April and May 2018. His lawsuit seeks to represent a collective of "[a]ll individuals who were classified as independent contractors while performing consulting work" for HCI, during the relevant limitations period.[2] (Borup Compl. ¶¶ 7-8.) Borup has not moved the Court for certification of this collective action under FLSA and it appears that the time to do so has passed. (Borup Docket No. 19.)

Plaintiff Shana Gray worked for HCI as an ATE before May 2017 and could therefore have been part of the Sanders settlement. She did not cash her check, however, but rather filed her own lawsuit against HCI in August 2018, two months after Borup.[3] Gray alleges a single misclassification claim under FLSA. Her Complaint defined the putative FLSA collective as "[a]ll individuals who were classified as independent contractors by [HCI] that currently work, or have worked, for [HCI] as an ATE or any other similarly-titled, hourly-paid position, during the applicable statute of limitations [] period and have not already released their claims." (Compl. ¶ 25.) Despite Gray's current insistence that her lawsuit was not intended to include medically trained consultants, her Complaint also states that "[a]lthough Plaintiff and other ATEs may have had different job titles and/or worked in different locations . . . this action may nonetheless be properly maintained as a collective action . . . ." (Id. ¶ 42.) Thus, she initially purported to represent even the medically trained individuals if those individuals worked for HCI during the relevant limitations period.

---

[2] The statute of limitations for FLSA claims is two years, which may be extended to three years on proof of a willful violation of the statute. 29 U.S.C. § 255(a).

[3] Gray filed her lawsuit in the Southern District of New York, which as discussed in more detail below, transferred the case to this Court.

3

In fall 2018, Borup and HCI engaged in settlement discussions. HCI did not inform Borup of the pendency of another action purporting to represent some of the same individuals that Borup sought to represent. HCI did not mention the <u>Gray</u> settlement in a conference with the Court on January 22, 2019. Indeed, HCI did not inform Borup or the Court about the <u>Gray</u> litigation until the end of January 2019, weeks after HCI and Gray had agreed to settle that matter.

In February 2018, Borup moved to intervene in <u>Gray</u> and asked the Court in the Southern District of New York to transfer <u>Gray</u> to Minnesota as related to his earlier-filed lawsuit. (Docket No. 38.) Gray opposed Borup's motion to transfer and moved for Court approval of the settlement. (Docket Nos. 45, 51.) The Court granted Borup's motion and declined to approve the settlement, noting that "CJS's strategic decision to cabin off this litigation from the Minnesota litigation may have had an adverse impact on the valuation of the [<u>Gray</u>] case." (Lelo Decl. (Docket No. 155) Ex. U (Hr'g Tr.) at 16.)

Shortly after this Court received the transferred <u>Gray</u> lawsuit, Gray once again sought Court approval of the settlement. (Docket No. 74.) The Court denied that motion without prejudice and ordered the consolidation of <u>Gray</u> and <u>Borup</u> to resolve Borup's allegations that the settlement was a reverse auction. (Docket No. 92; <u>see also</u> Hr'g Tr. at 21 (stating that the steps HCI took to prevent Borup's attorneys from finding out about <u>Gray</u> and the settlement were "at least indicative of a reverse auction"). United States Magistrate Judge David T. Schultz oversaw discovery related to Borup's reverse-auction

4

allegation. That discovery is now complete, and Gray again asks the Court to approve the settlement.

## DISCUSSION

### A.     Settlement Approval under FLSA

In evaluating a FLSA collective settlement, the Court need only ensure "that [the] settlement reached in adversarial proceedings represents a fair compromise of a bona fide wage and hour dispute" and "is fair and reasonable for all who are affected by it." McInnis v. Ecolab Inc., No. 11cv2196, 2012 WL 892187, at *2 (D. Minn. Feb. 17, 2012) (R. & R. of Keyes, M.J.) (R. & R. adopted by 2012 WL 892192 (D. Minn. Mar. 15, 2012)).

> To determine whether settlement terms are fair and equitable to all parties, a district court may consider a multitude of factors, including (1) the stage of the litigation and the amount of discovery exchanged, (2) the experience of counsel, (3) the probability of the plaintiff's success on the merits, (4) any overreaching by the employer in the settlement negotiations, and (5) whether the settlement is the product of arm's length negotiations between represented parties based on the merits of the case.

Stainbrook v. Minnesota Dep't of Pub. Safety, 239 F. Supp. 3d 1123, 1126 (D. Minn. 2017) (Wright, J.). Borup contends that HCI overreached and that the settlement was not the product of arm's-length negotiations.

#### 1.     Settlement Terms

The Gray settlement agreement redefines the settlement collective as "all Persons who held the position of Epic Activation Consultant and worked for [HCI] from August 14, 2015 until such time as the position was eliminated in May 2017, and who have not released their claims against [HCI] and/or did not participate in the settlements of [Sanders]." (Docket No. 149-1 at ¶ 2.) The proposed settlement collective therefore does

5

not include Borup, because he was not an Epic Activation Consultant and worked for HCI in April and May 2018, after the proposed Gray collective closed.

HCI agreed to settle the Gray collective's claims for $500,000. The parties have agreed that Gray's attorneys will receive $165,000, and there are slightly more than $18,000 in administrative and other costs. In addition, they seek a representative award of $10,000 for Ms. Gray. All of these items will be deducted from the $500,000 settlement fund.

Under the terms of the settlement, each of the 536 potential collective members will receive an initial check for $25.00. They have 120 days to cash those checks; if they choose not to do so, they will not waive their claims against HCI. Those cashing the check agree to release HCI "from any and all causes of action, claims, rights, damages . . . and issues of any kind or nature whatsoever, whether known or unknown . . . that could have been asserted in the Complaint." (Stephan Decl. Ex. 1 (Docket No. 149-1) ¶ 15.) The release specifies that the "claims that are released by virtue of this Agreement include, but are not limited to, all state and federal statutory, regulatory, constitutional, contractual or common law claims for wages, unpaid wages, unpaid minimum wage or overtime wages, [and] untimely paid wages" among a laundry list of other compensation-related claims. (Id.)

After the 120 days have passed, the amount remaining will be divided by the total number of hours over 40 worked by all members of the putative collective, to determine an "overtime hour value" or overtime hourly rate. Each individual will then receive their pro rata portion of the remaining amount based on the total number of overtime hours they

6

individually worked. HCI will keep any settlement money remaining after this process is complete.

After deducting attorney's fees, costs, and the class-representative award, the amount available to pay the class damages is $306,625. If all 536 individuals cash the initial $25 check, $293,225 will remain to be divided by the total number of overtime hours the collective worked. At the hearing, Gray's counsel stated that the potential 536 collective members worked approximately 49,000 overtime hours during the limitations period.[4] The "overtime hour value" for the collective is thus just under six dollars per hour. Because the collective's members already received their regular pay of an average of $22.37 for all hours worked,[5] the settlement results in an average overtime hourly wage of $28.37.

In evaluating this settlement, the terms of the Sanders settlement are relevant. The total amount of the Sanders settlement was $3,240,000. Each of the four class representatives received $10,000, attorney's fees were $1,080,000, and costs and administrative fees amounted to $60,000. That left $2,080,000 to be distributed to a class approximately twice as large as the class here. If this amount had been divided evenly among the 1,174 collective members who cashed their checks, each Sanders collective member would have received $1,771.72. Here, the average collective member worked

---

[4] It is notable that Gray has not proffered evidence to back up her contentions regarding the class's damages.

[5] At the hearing, counsel stated that the average overtime rate for the collective, had HCI paid them as FLSA required, would have been $33.55 per hour. See 29 U.S.C. § 207(a)(1) (requiring overtime compensation "at a rate not less than one and one-half times the regular rate at which [the employee] is employed"). An hourly wage of $22.37 results in an overtime rate of $33.55 ($22.37 + $11.18 = $33.55).

91.4 overtime hours, and if each participates in the settlement, will receive approximately $571.57. The Gray settlement is thus less than one-third of the Sanders settlement in terms of average value to each collective member.

As Gray argues, some reduction in value is to be expected between her claims and those raised in Sanders, given the lack of any state claims and that HCI reclassified the consultant position in 2017. She further notes that the Gray settlement collective consists entirely of individuals who chose not to participate in Sanders, making this their second bite at the apple. However, HCI's May 2017 reclassification of most of its consultants meant that Gray had a high likelihood of prevailing in this litigation, and the relatively low recovery does not reflect that likelihood of success.

Finally, as noted above, the settlement agreement's release purports to release any claims the collective might have against HCI. Courts frequently deny approval for FLSA settlements with such broad releases. (See Sanders Docket No. 95 at 7-8 (citing cases).) Gray does not explain why such a broad release is necessary or warranted in this matter.

### 2.     Reverse Auction Allegations

Discovery on the settlement revealed some unusual conduct on the part of HCI. One week before agreeing to settle Gray, HCI contacted the law firm that had represented plaintiffs in the Sanders litigation stating that HCI wanted to "explore a further settlement that wipes out all pending claims relating to Sanders." (Lelo Decl. Ex. X at 235-36.) HCI argued at the hearing that this email only sought the firm's advice on the potential for cy pres distribution of the remaining funds in the Sanders settlement account. But the firm's response to the email belies this characterization: in February 2019, the law firm responded that they had three potential clients who could "serve as class representatives in any

8

settlement with HCI that could potentially address remaining liability after the Sanders lawsuit, and/or that could potentially be inclusive of the other two lawsuits filed following the Sanders lawsuit." (Id. at 235.).)

This email, in addition to HCI's failure to inform Borup or the Court about the existence of the Gray litigation until after it had agreed to resolve Gray's claim, are potentially indicative of a reverse auction. But any such finding in that regard is unnecessary here, where the objective terms of the settlement, discussed in detail above, counsel against approval of the current agreement. The Court will therefore deny the Motion for Approval without prejudice, so that the parties may more fully litigate the related Borup claims, which may ultimately affect the value of the Gray settlement.

**B.    First-Filed Rule**

Borup asks the Court not only to reject the settlement, but also to dismiss Gray under the first-filed rule. Gray contends that the Court should ignore this request, arguing that it is improperly made because Borup did not make a motion to dismiss. But Borup is not a party to Gray. Rather, Borup intervened in Gray for the limited purposes of opposing the settlement and seeking to transfer venue. Borup could not properly have filed a motion to dismiss in Gray.

Gray also argues that Borup is bringing this request too late, because it is now nearly a year and a half since Gray was transferred to the District of Minnesota. And Gray contends that dismissal is not appropriate where two actions are pending before the same judge. See Luminara Worldwide, LLC v. Liown Elec. Co. Ltd., No. 14cv3103, 2015 WL 11018002, at *25 (D. Minn. Apr. 20, 2015) (Nelson, J.) (noting that first-filed rule does not apply "because both lawsuits were filed in the same District and are before the same

9

district court judge"); see also Woodards v. Chipotle Mexican Grill, Inc., No. 14cv4181, 2015 WL 3447438 (D. Minn. May 28, 2015) (Nelson, J.).  The decision in Woodards noted that when the plaintiff in the second-filed case is not a member of the first-filed case's collective, the first-filed rule does not apply.  Woodards, 2015 WL 3347438, at *4-5.  Borup has never sought collective certification.  Thus, the only members of Borup's collective are those who have opted in.  Gray has not opted in to Borup, and thus she is not a plaintiff in Borup.  And Borup is not part of the newly limited Gray collective.  To the extent that the individuals who have opted in to Borup fall within Gray's collective, they can choose not to be part of Gray and remain in Borup.  The danger of duplicative litigation therefore does not exist.

Borup's request for dismissal of Gray is denied.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that** the Renewed Motion for Approval of Settlement (Docket No.  147) is **DENIED without prejudic**e.

Dated: August 4, 2020

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge